Ex Parte HARRY KNIGHT, GUY KNIGHT and FRANK CAREY, Petitioners.

In Banc, October 18, 1923.

1. **BAIL: Murder: Reputation of Defendant.** Testimony to show that in the communities in which he lived he had a bad reputation for truth, veracity, morality and peace is not competent on the question whether the defendant, charged with murder in the first degree, is entitled to bail.

2. ———: ———: **Deposition After Filing of Return.** In this case the right of defendants, charged with murder in the first degree, to bail, is determined upon the testimony taken at the preliminary hearing before the justice of the peace, and therefore it is not determined whether evidence taken by depositions on behalf of the State before a notary public after the filing of the return to the writ of *habeas corpus* was competent under Section 1914, Revised Statutes 1919. Besides, so much of the evidence contained in said depositions as was competent added nothing to the State's case as made before the justice of the peace.

3. ———: ———: **Flight: Presumption of Guilt.** The flight of defendant does not raise a presumption of guilty of murder in the first degree. It does not affect the grade of the crime, and does not add materially to the probability of guilt when the question of his right to bail is being considered.

(63)

4. ———: ———: **Striking Deceased with Pistol.** Defendant, with four others in an automobile, drove to the house of deceased, a very large man, and getting out of the car leaned his arm upon a post, and said to deceased, as he came out of the house, "What did you kill them hogs for?" According to one witness, defendant put his hand to his hip pocket, and was immediately knocked down by deceased. Then two of the others jumped out of the automobile and rushed deceased, who knocked them both down, one after the other. Then the other two got out of the car, and all engaged in a general fight, five against one, in which deceased was valiantly holding his own, when one of them tripped him and he fell, and as he attempted to rise defendant struck him on the head with the butt of a revolver, which he held by the barrel, knocking him senseless, and from this blow he died a few hours later. *Held*, that it seems probable that, if defendant deliberately intended to kill deceased, he would have shot him when the difficulty began, and that his possession of the pistol is not conclusive evidence that he intended to use it.

5. ———: ———: **Conspiracy.** Although ill-feeling and bad blood had existed between deceased and the five defendants, the fact that they all went together in an automobile to his house, even if with the intention of calling him to an account, does not convincingly indicate a premeditated intention to commit a felony, especially where, after one of them had asked him why he had killed his hogs, deceased struck the first blow and it was only after he had almost shown himself capable of a successful fight against the five that the fatal blow was struck, for these facts might reasonably authorize a jury to infer that the blow was struck in a sudden heat of passion engendered by the general fight.

6. ———: ———: **Determination of Guilt.** On the application for bail by defendants charged with murder in the first degree, the court does not determine whether a jury, upon a trial, would be justified in finding them guilty of murder in the first degree; it only determines whether, on the facts produced, the probability of their guilt is so strong that they are not entitled to bail.

### Habeas Corpus.

WRIT AWARDED (*upon condition.*)

*Harry Friedberg, Francis O'Sullivan* and *Kimbrell & Wafford* for petitioners.

*Jesse W. Barrett,* Attorney-General, and *W. L. Chaney* for the State.

WHITE, J.—The petitioners, August 9, 1923, filed in this court their application for writ of *habeas corpus,* alleging that they were unlawfully deprived of their liberty by Ed Duncan, Sheriff of Johnson County, and John L. Williams, Marshal of Jackson County. The petition states that before Hon. George W. Rayhill, Justice of the Peace at Warrensburg, Johnson County, Missouri, the petitioners were charged with the crime of murder in the first degree in killing one George McCormick; that on the fourteenth day of July, 1923, petitioners Guy Knight and Frank Carey had a preliminary hearing before said justice and were held to the Circuit Court of Johnson County, and bail refused. Later Harry Knight was arraigned before said justice, and by agreement the evidence obtained at the hearing of the other petitioners was submitted in his case. He also was held without bail.

The petition then avers that the proof produced at the preliminary hearing showed that the presumption of guilt was not great, and that the petitioners were not guilty of murder in the first degree; that they were able to give good and sufficient bond for their appearance in any court in which they might be prosecuted for said alleged offense, and prayed that this court fix a reasonable bond conditioned on their appearance, etc.

To our writ issued thereupon Ed Duncan, Sheriff of Johnson County, filed his return, August 9, 1923, in which he set out the verdict of the coroner's jury finding that McCormick came to his death June 23, 1923, at the hands of Harry Knight, Guy Knight, Frank Carey and Chester Kerr, and that the same was wilful and premeditated. Then follows a statement of the proceedings before the justice of the peace, the preliminary hearing, the commitment, and the affidavit of the coroner charging the petitioners with murder in the first degree, sworn to on the twenty-sixth day of June, 1923. To this return is attached the evidence taken at the preliminary hearing of Guy Knight and Frank Carey, July 14, 1923.

Afterwards, on the eighteenth day of August, 1923, evidence was taken on behalf of the State before William

E. Suddath, a notary public, for the purpose of showing other facts in relation to the alleged crime, and the evidence taken was returned and is before us. The petitioners objected to the evidence taken at that time, on the ground that under Section 1914, Revised Statutes 1919, the only evidence proper for consideration in a *habeas corpus* proceeding is that in the preliminary examination before the magistrate.

The evidence taken at the preliminary examination shows that on the twenty-third day of June, 1923, petitioners Harry Knight, Frank Carey, and another person afterwards identified as Chester Kerr, drove from Kansas City about three o'clock in the afternoon, in a large car resembling a Cadillac, and arrived at Holden, in Johnson County, shortly before six o'clock the same day. At that time the three men mentioned, and also Guy Knight, brother of Harry, and Ben Knight, their father, were in the car. McCormick and Ben Knight lived on small farms adjoining each other, and adjacent the town of Holden. A witness living in the neighborhood, Mrs. Mary Mittong, saw the car leaving Kansas City, also drove to Holden and saw the subsequent occurrence from a neighbor's house across the street from the McCormick place. Others also witnessed the occurrence. The car containing five men stopped at the McCormick house. Harry Knight got out of the car, stepped upon the walk and, leaning his arm on a post, said to McCormick, as he came out of the house, "Mac, what did you kill them hogs for?" According to one witness, Knight put his hand to his hip pocket and was immediately knocked down by McCormick. Then Guy Knight, and the father, Ben Knight, jumped out of the car and rushed to McCormick. McCormick knocked them both down, one after the other. Then Carey and Kerr got out of the car and all engaged in a general fight, according to some of the evidence, five men against one, in which McCormick was valiantly holding his own. McCormick was a very large man, several inches over six feet in height, and weighed 230 pounds. While this fight was going on, Carey tripped McCormick and he fell. His

assailants then attempted to drag him towards the car. McCormick attempted to get up, when Harry Knight struck him on the head with the butt of a revolver, which he held by the barrel, knocking him senseless. From this wound 'McCormick died at one o'clock the next morning.

While this was going on, and while McCormick was fighting a lone hand against the other five men, one Mr. Smith, who was at the McCormick home at the time, witnessed the beginning of the fight, and saw McCormick knock down the Knights, got a hammer and started towards the combatants. Harry Knight then drew his revolver and ordered him to stop. Discretion was the better part of valor: Smith retired to the porch and suggested to Lowell McCormick, a young son of George, to get his gun; that they were killing his father. Lowell got his gun and shot Ben Knight almost immediately after McCormick was struck down by Harry Knight. The Knights then retreated, put their father in the car and drove away. Ben Knight died about an hour afterwards.

All this time there was considerable confusion and the sequence of events is not perfectly clear. It seems fairly certain that Smith got his hammer and started to join the fray before McCormick received the fatal blow, and Ben Knight was shot by Lowell McCormick almost immediately after McCormick received the fatal blow. Physicians who examined McCormick's body after he was dead found bruises on his shoulder and face, on his forehead, and on his jaw, the latter being swollen. They testified, however, that the wound inflicted by the butt of the revolver fractured the skull and produced the death.

The depositions taken August 18th showed that for some time Ben Knight's hogs had been annoying McCormick, and McCormick had killed some of them; that Knight had procured a warrant for McCormick's arrest, and that McCormick had procured a city warrant for the arrest of Guy Knight for failing to bury the hogs which he had killed; Guy Knight had been arrested and his case was pending in the police court at the time of the tragedy. It was further shown that on the twenty-third day of

June, the day of the killing, Ben Knight rode on horseback to Kingsville, about five miles from Holden, and remained there all day, and that Harry Knight, with Carey and Kerr, drove through Kingsville, saw Ben Knight, and after passing him, backed up to where he stood and took him into the car. This was a few minutes before the difficulty occurred. It is further shown that Guy Knight was arrested at Holden two hours after the killing, that Frank Carey was arrested in Kansas City June 24th, and that Harry Knight was arrested at Mobile, Alabama, July 31, 1923. Also, evidence was offered to show that in communities where he lived Harry Knight had a bad reputation for truth, veracity, morality and as a peaceable citizen.

I. The petitioners object to all the evidence taken by deposition on the ground that under Section 1914, Revised Statutes 1919, in this proceeding the only competent evidence was that taken and certified by the committing magistrate. That part of the evidence taken **Reputation.** by depositions attacking the reputation of a defendant, certainly was not competent, whether taken at that time or any other time. Such testimony could be competent at the trial only if and when the accused should put their reputations in issue. [State v. Conway, 241 Mo. l. c. 289; State v. Levitt, 278 Mo. 378.] It certainly was not in issue here.

II. Whether any evidence taken by deposition after the filing of the return here was admissible, it is unnecessary to determine. It is sufficient to say that the depositions added little to the probability of guilt besides what was shown at the trial before the committing magistrate. **Depositions.** It gives an account of the difficulty between the Knights and McCormick on account of Knight's hogs which McCormick had killed, which difficulty had already appeared. The arrest of different parties merely emphasized the state of feeling which would hardly affect the quality of the crime to the dis-

advantage of the petitioners. It is claimed that Ben Knight's going to Kingsville on horseback, and apparent waiting there for Harry Knight to come, was evidence of premeditation and deliberation, and perhaps of a conspiracy. The car was driven by Harry Knight at a rapid rate of speed through the town as if he were not expecting to stop there for any purpose. He drove quite a distance beyond where he saw his father standing, before he could stop his car. It was shown in the preliminary hearing that Harry Knight and his two companions left Kansas City in a large car and in a space of about two hours appeared at McCormick's place in Holden with his father and brother then in his car. It would not matter where he picked them up. What appeared at the preliminary hearing would be just as strong evidence of prior arrangement as the additional incident of picking up Ben Knight at Kingsville would make it. So we think that the depositions, aside from the incompetent attack upon the reputation of Harry Knight, added nothing to the State's case.

III. It is claimed that the evidence of flight raised the presumption of guilt. As stated, Harry Knight was arrested at Mobile, Alabama, a month after the occurrence. This appears in the depositions taken. It is claimed that this additional evidence is import-

Flight.

ant. But giving the State the benefit of the fact that Harry Knight fled and was arrested in Alabama, what effect does it have upon the probability that he was guilty of murder in the first degree? If flight was consistent with his innocence of that particular crime it would possess no weight against him. [State v. Harris, 232 Mo. 323; State v. Goodson, 252 S. W. 366; 8 R. C. L. p. 192.]

Conceding that Harry Knight's flight from the scene of the fight would indicate a conscious guilt of *some* crime —although it is stated by the State that feeling was high against the petitioners and they were unsafe in jail in Johnson County—would not Harry Knight be as apt to flee to escape arrest if he felt he was guilty of murder in

the second degree as he would if he felt he was guilty of murder in the first degree? If he was conscious of guilt it does not necessarily follow that it was conscious guilt of any particular grade of crime. So, we think that the evidence of flight does not add materially to the probability of guilt.

As this court has said in one of its latest cases upon the subject, Ex parte Verden, 291 Mo. 552, l. c. 563, before a defendant should be committed without bail, "such facts must be shown as to raise a strong presumption of guilt of the crime charged."

The blow which killed McCormick was struck by Harry Knight with the butt of his revolver. If he had deliberately intended to kill McCormick it seems as if he would have shot him when the difficulty first began. His possession of the weapon is not conclusive that he intended to use it. Owing to McCormick's size and strength and his apparently aggressive character, Harry may have intended merely to stand McCormick off. He did not draw his weapon until after he, his father and brother had been knocked down and Smith had appeared with a hammer as an ally of McCormick. He then pointed his revolver at Smith and told him to stand off. This indicates an intention on his part to have the fight proceed against McCormick without interference from the outside while he had overwhelming odds in his favor. Even that intention may have been formed after the fight began. Still he did not shoot McCormick, but in the fray he struck him on the head with the butt, showing he did not intend to shoot. It is by no means certain that he intended to kill. In fact, it rather appears that he did not. So far as the actual combat was concerned, evidence of deliberation on the part of Harry Knight was quite weak.

It is claimed by the State, however, that there was evidence of a conspiracy in pursuance of which Harry Knight and his friends came from Kansas City and were joined by his father and brother before going to the McCormick home. There was bad blood between the

*Intention to Kill.* [margin note]

parties and those acts indicate a predetermined intention to have a difficulty with McCormick. Undoubtedly it is the law, if the Knights appeared at the McCormick home with the intention of committing a felony of any kind and in pursuance of that attempt McCormick was killed by one of them, then they would be guilty of murder in some degree. We think the evidence is not convincing that they entertained an intention to commit a felony. If they appeared there for the purpose of committing any crime short of a felony and McCormick was killed without deliberation and premeditation, it would reduce the grade of the crime. The Knights, no doubt, intended to call McCormick to account; that they intended to assault him is not so certain. Harry Knight asked why he killed his hogs. A soft answer might have turned away wrath. McCormick himself struck the first blow, and he struck several blows before there was any effective return. It was only after he had held his own in the general fight, and had shown almost that he was capable of a successful defense against the five men, that the fatal blow was struck. He had bruises and contusions on various parts of his body which did not seem to have affected his fighting capacity. It would be entirely reasonable for the jury to infer that the blow of Harry Knight was struck in a sudden heat of passion engendered by the general fight in which he and the others were knocked down. It must be noted that the occurrences occupied but a very short time; it could have been only the space of seconds, hardly minutes, between the time when Harry was knocked down until he struck McCormick. We are not in this proceeding to determine whether a jury would be justified in finding the defendants guilty of murder in the first degree; we are only to determine whether on the facts produced the probability is so strong that they are not entitled to bail. We conclude that the evidence is not sufficient to warrant denial of bail.

For these reasons this court on August 21, 1923, on considering the petition of petitioners, and the evidence mentioned, ordered that Harry Knight be re-

leased upon giving bond in the sum of fifteen thousand dollars; that Guy Knight and Frank Carey be released upon giving bond each in the sum of ten thousand dollars, the sureties on such bonds to be approved by this court, and that the prisoners be remanded to the custody of the Sheriff of Johnson County until such conditions should be complied with. This opinion is filed in pursuance of leave given on said date.

Harry Knight thereafter presented his bond, as required by said order, and Guy Knight presented his bond as required by said order, and such bonds were filed in this court and approved by this court.

All concur, except *Ragland, J.,* who dissents.