## IN RE RAYMOND SCHULTZ et al., Petitioners.

In Banc, January 4, 1924.

1. **BAIL: Intent to Kill.** Unless an intent to kill is made evident or facts are produced which raise a strong presumption of such intent, the accused cannot be denied bail.

2. ———: ———: **Striking With Fist.** The evidence shows an intent to assault deceased. His death resulted from a blow on the head and the penetration of the brain by "just a little sliver of bone between a quarter of an inch and a half inch" which had been broken off of one "of the two little wings of bone that join the skull together"—a thing unusual and not to be expected. No weapons were seen before, during or after the incident, but deceased was rendered unconscious and died in a short time. There were abrasions and multiple contusions on the forehead "as if he had been struck with the fist." The coroner doubted the ability

of petitioners to strike a blow with the fist that would produce the result, but a physician, offered as an expert, testified that the slivering of the bone could have resulted from a blow of the fist. The skin was not broken, and a police officer testified the slivering of the bone could have been done with a "black-jack" without breaking the skin on the forehead, but no one saw or found a black-jack, nor was it shown that a black-jack is a deadly weapon, and the evidence does not measure up to the constitutional standard as "proof" that deceased was struck with a weapon other than the fist. *Held*, that no presumption of an intent to kill arises from a fatal blow struck with the fist, and the accused are entitled to bail.

*Habeas Corpus.*

*Bruce Barnett* and *Daniel E. Bird* for petitioners.

*W. G. Lynch, B. S. Kimbrell* and *H. P. Ragland* for John L. Miles, Marshal.

JAMES T. BLAIR, J.—*Habeas corpus* to fix bail. Immediately after the hearing the order admitting petitioners to bail was made, and the reasons for that action will now be given. The indictment charges petitioners with murder in the first degree. The testimony of all witnesses whose names are indorsed on the indictment and of some others has been taken and is brought here with written statements made by some of the petitioners. The case was presented upon this evidence. In the view we take of the case, the following statement of the evidence will suffice.

About May 1, 1923, the Fixture Hangers Union went out on strike. Rose, the deceased, and Olden were fixture-hangers by trade, but were not members of the Union. They continued to work in Kansas City and vicinity, and when this was discovered Union officials began to make efforts to "get them off" of the jobs on which they were working. Efforts to persuade them to cease work and to join the striking union were made. They were induced to talk the matter over with Union officials. No violence was offered them or threats made.

On July 2, 1923, they were working at the Gary residence at 1228 W. Fifty-sixth Street. Ricke, the business agent of the Union, told some of the petitioners he wanted to get Olden and Rose off the job, and sent Schultz, Matthews and Baber to them to "scare the two men off the job." The three met petitioner Alley, and he went with them. When they arrived Olden and Rose were finishing hanging a chandelier. They were upon ordinary step-ladders. One of the petitioners began the conversation by asking Olden and Rose if they had a Union card. The answer was in the negative. The next question was whether they, Olden and Rose, "would like to get off of this job." Rose said he "didn't care to" and asked the men who sent them. One of the petitioners replied they were "sent out here from the Building Trades Council to see that you men get off this job or else ————." Rose asked: "Else what?" Petitioner replied: "Or else, by God, you will take the consequences." At that moment Rose stepped down off the ladder, and, according to Olden, stooped to pick up some small glass prisms. One of the petitioners said, "Don't pick that up," and said to Rose, "I mean you," and then pushed Rose on the shoulder. Olden saw nothing more because he, too, was just reaching the floor from the ladder, and as he turned someone struck him and he was rendered unconscious. There is evidence that Baber kicked him thereafter, but his injuries were not of a serious or dangerous character, according to the physician who attended him. Schultz admits striking Rose, and says Alley struck him. The men left almost immediately. Rose was rendered unconscious and died in a short time. No weapons were seen either before, during or after the incident, and there was nothing in the room available for use as a weapon. Rose's head and body showed he had been struck several times, but the skin was not broken at any place. His nose was broken and there were abrasions and "multiple contusions" on his forehead as if he had been struck with the fist,

according to the deputy coroner. This official made the autopsy. This disclosed that death resulted from the penetration of the brain by "just a little sliver of bone between a quarter of an inch and a half inch" which had been broken off of one "of the two little wings of bone that join the skull together." The doctor may have referred to one of the orbitosphenoid processes. He said this was a "very peculiar case." He made it clear that he doubted the ability of either of the petitioners to strike a blow with his fist which would produce the result, but frankly confessed that he was puzzled by the fact that the skin was not broken, referred counsel to the police officers on the question whether there was a weapon which would deliver such a blow without breaking the skin, and finally declared he didn't know whether or not it could have been done with anything other than the fist. There was evidence of other blows on the head and one on the chest, but it is not said they were dangerous in character. A physician, offered as an expert, testified the slivering of the bone in question could have resulted from a blow with the fist. A police officer testified it could have been done with a black-jack without breaking the skin on the forehead. Whether a black-jack is a deadly weapon or whether it would have produced the "multiple contusions" "like a blow with the fist" was not shown. There was direct evidence that Olden was kicked, but it is shown that the men who assaulted Olden did not assault Rose.

Under our Constitution "all persons shall be bailable by sufficient sureties, except for capital offenses, when the proof is evident or the presumption great." The only capital offense (Ex parte Dusenberry, 97 Mo. 504) of which petitioners could be convicted under the indictment against them is that of murder in the first degree. The statute (Sec. 3230, R. S. 1919) defines murder in the first degree: "Every murder which shall be committed by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated

killing, and every homicide which shall be committed in the perpetration or attempt to perpetrate any arson, rape, robbery, burglary or mayhem, shall be deemed murder in the first degree." There is neither charge nor evidence tending to prove murder by poison or lying in wait, or homicide committed in the perpetration or attempt to perpetrate "any arson, rape, robbery, burglary or mayhem." In this case the crime charged must come within the description of a "willful, deliberate and premeditated killing" in order to be murder in the first degree and be a capital offense, i. e. punishable by death.

The essentials of murder in the second degree under our statute are willfulness, malice and premeditation. [State v. Curtis, 70 Mo. l. c. 600; State v. Speyer, 207 Mo. l. c. 552.] It is always bailable because it is not capital. It makes no difference how evident the proof or great the presumption of willfulness, malice and premeditation, if nothing more than these appear, bail cannot be denied.

In order to constitute first degree murder, in a case like this, the element of deliberation must be added to those included in second degree murder. [State v. Kyles, 247 Mo. l. c. 648.] To make the offense capital all four elements must appear; and to justify denial of bail the presence of each must be made out by proof that is evident or by presumption that is great. It is also to be kept in mind that the question here is not whether the evidence presented would support a jury's verdict of guilt of first degree murder. The test on that inquiry in this court would be whether there was substantial evidence tending to prove each element of that offense. The test in this proceeding is whether the evidence presented and under consideration on this hearing constitutes proof that is evidence of guilt of murder in the first degree, or establishes facts and circumstances which make the presumption of such guilt strong. [Ex parte Verden, 291 Mo. l. c. 562; Ex parte Knight, 301 Mo. 63.]

In this case the fatal blow was that which broke the sliver, as the deputy coroner designated it, off of the sphenoid bone. There is little or no evidence that any other blow or wound was of serious character. There is no direct evidence concerning the delivery of this fatal blow except that found in the statements made by certain petitioners, and these contain no evidence of any blow than one struck with the fist. The net result of the testimony of the deputy coroner is, as he finally said, that he didn't know whether the blow which killed Rose could have been given with the fist. He was puzzled. The testimony of the experts goes no further than possibilities. They say the wound could have been inflicted with a black-jack. One says it could have been given with the fist. The evidence does not explain what a black-jack is. There is no proof that makes it evident that the blow was given with a weapon. The dubious testimony of the deputy coroner and the opinions of experts that a black-jack could have produced the wound is to be considered in connection with the expert testimony that a blow of the fist might have caused it, and the direct evidence that it did cause it. Taken together the evidence does not measure up to the constitutional standard as proof that Rose was struck with a weapon other than the fist. If the fatal blow was given with the fist, there is no presumption from the blow itself that he who struck it was animated by an intent to kill. The character of the wound is quite unusual and, according to the testimony, hardly to be expected from a blow of the fist. The question whether a trier of the facts could or ought to draw an inference of intent to kill from such a blow has been the subject of judicial inquiry (McAndrews v. People, 71 Colo. 542, 24 A. L. R. 655, 666, and note; People v. Crenshaw, 298 Ill. 412, 15 A. L. R. 671, 675, and note; State v. Hyland, 144 Mo. 302; State v. John, 172 Mo. 220; State v. Snow, 293 Mo. l. c. 151, et seq.), and it may be said the decisions are not in entire harmony. In this case the other mistreatment

of Rose is not shown to have been of a character in itself dangerous to life, and the blow which resulted in death did so because of a slivering of the sphenoid bone which the evidence makes clear was a thing unusual and ordinarily not to be expected. In the Hyland and John cases above cited the accused, in each, had struck a blow so powerful that it hurled the deceased to the granitoid pavement with great violence and resulted in a skull fracture which caused death. The court seems to have had in mind that the defendant in each case must have known the blow would cause the assaulted person to fall and strike the pavement violently and must have intended the "natural" result of this. Whatever may be said of those decisions, it is clear they involved on the question here facts quite unlike those in this evidence. It makes no difference that the evidence shows an intent to assault Rose, nor that the assault committed constitutes a serious offense; unless an intent to kill is made evident or facts proved which raise a strong presumption of such an intent, no murder in the first degree is proved with that clearness which the Constitution requires before bail can be denied. Whether there is sufficient evidence to warrant the submission to a jury of murder in either degree is not pertinent to the present inquiry. Under the Constitution and the evidence produced to us, bail must be allowed. The amount in the case of each petitioner is fixed at $15,000. All concur.

Headnotes 1 and 2:   Bail, 6 C. J. sec. 171.